******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

DIANE BOISVERT ET AL. *v.* JAMES GAVIS
(SC 20049)
(SC 20053)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiffs, the maternal grandparents of the defendant father's minor
child, B, filed, in the trial court, a petition for visitation with B pursuant
to statute (§ 46b-59). The defendant had been granted custody of B
following the death of B's mother, before which the plaintiffs enjoyed
a significant relationship with B and contributed meaningfully to his
care. The defendant unilaterally terminated visitation shortly after the
mother's death, contending that the plaintiffs did not abide by his wishes
with respect to B's care during B's time with them, and also because
he believed that the plaintiffs were seeking to have him incarcerated
so that they could be awarded custody of B. Following an evidentiary
hearing, the trial court granted the plaintiffs' petition, finding that the
plaintiffs had a parent-like relationship with B and that the denial of
visitation would cause B real and significant harm, and the defendant
appealed. Thereafter, the defendant filed a motion seeking a no contact
order between B and his maternal aunt, R, who was living with B's
maternal grandmother at the time. The court denied the motion, and
the defendant, upon certification by the Chief Justice pursuant to statute
(§ 52-265a) that a matter of substantial public interest was involved,
filed an appeal from the denial of the motion, which was consolidated
with his direct appeal. While the defendant's consolidated appeals were
pending, the defendant offered the plaintiffs visitation with B in an
amount that was substantially less than what the trial court had pre-
viously ordered in conjunction with the plaintiffs' petition. In conjunc-
tion with his offer, the defendant filed a motion to open and to terminate
visitation, contending that the trial court was divested of subject matter
jurisdiction in light of his offer, which the trial court denied. Meanwhile,
the defendant discontinued B's visitation with the plaintiffs, and the
plaintiffs moved for contempt.. The court found the defendant in wilful
contempt for failure to comply with its visitation order. Subsequently,
the plaintiffs filed a second motion for contempt on the basis of the
defendant's continued refusal to comply with the trial court's orders,
which the trial court granted, and the defendant filed an amended appeal.
On appeal, the defendant claimed, inter alia, that the trial court's order
of visitation violated the implicit requirements of § 46b-59 and the due
process clause of the fourteenth amendment to the United States consti-
tution because it did not include a provision directing the plaintiffs to
abide by the defendant's decisions regarding B's care while B was visiting
with the plaintiffs and that the court's order violated the defendant's
fundamental parental rights because the amount of visitation ordered
was more than was necessary to further the state's compelling interest
in sustaining B's relationship with the plaintiffs. *Held*:

1. The trial court correctly determined that it was not deprived of subject
matter jurisdiction by virtue of the defendant's postjudgment offer of
visitation to the plaintiffs and, therefore, properly denied the defendant's
motion to dismiss the plaintiffs' action: the defendant's postjudgment
offer of visitation did not render the action moot because, even if a
controversy involving an existing order of third-party visitation could be
rendered moot due to a custodial parent's voluntary offer of meaningful
visitation with the third party, the defendant failed to establish that his
particular offer of visitation was made in good faith and with the inten-
tion of allowing visitation rather than of avoiding or undermining the
existing visitation order, particularly given that the defendant had consis-
tently and vehemently opposed the plaintiffs' visitation and twice had
been held in contempt for his refusal to comply with the court-ordered
visitation; moreover, this court concluded that, in light of its determina-
tion that the trial court was not divested of jurisdiction by virtue of the
defendant's postjudgment offer of visitation, that court also properly

rejected the defendant's claim that the trial court's contempt order was void for lack of subject matter jurisdiction.

2. There was no merit to the defendant's claim that the trial court's visitation order violated the implicit requirements of § 46b-59 and the due process clause of the fourteenth amendment insofar as it failed to include a provision directing the plaintiffs to abide by his decisions, as a fit parent, regarding fundamental aspects of B's care during B's visitation with the plaintiffs:

a. There was no implicit requirement in § 46b-59 that the trial court include a provision directing a third party to abide by a fit parent's decisions regarding the child's care during visitation with the third party, as subsection (e) of that statute simply authorizes the trial court to craft the terms and conditions of third-party visitation and provides that those terms and conditions are to be guided by the best interest of the child.

b. The defendant could not prevail on his claim that the due process clause compels a trial court ordering third-party visitation to include a provision requiring the third party to abide by all of a fit parent's decisions regarding the child's care during visitation and that § 46b-59 was unconstitutional as applied to the facts of the present case insofar as the order of visitation allowed the plaintiffs to override the defendant's exercise of his fundamental parental right to make decisions regarding B's care: constitutional and statutory principles governing third-party visitation do not confer on a parent the absolute right to dictate the terms and conditions governing third-party visitation, and the fundamental purpose of the statute, to sustain the deep, emotional bond between the child and the third party, would be thwarted if a parent opposing third-party visitation were given unfettered authority to micromanage the visitation and to supplant the third party's caregiving choices during the period of visitation with his or her own; nevertheless, a court, in assessing what terms may be in the best interest of the minor child, must accord special weight to a fit parent's preferences when those preferences pertain to the most fundamental aspects of a child's life, such as the child's education, health, religion, and association, but the court should satisfy itself that the parental request concerning such preferences is made in good faith before according those preferences special weight; moreover, a custodial parent seeking to impose terms and conditions on a court's visitation order must make a specific and timely request that includes an explanation as to how the requested terms and conditions further the best interest of the child, and, if the parent believes that the requested terms and conditions are necessary to protect his or her fundamental parental rights, he or she must specify the alleged constitutional nature of the request and the right asserted; furthermore, in the present case, the defendant's request was neither timely, as it was filed after the close of evidence, after the issuance of the visitation order, and despite the defendant's knowledge that R was living with D at the time of the evidentiary hearing, nor specific, as it was unaccompanied by any explanation as to why his requested no contact order between B and R was desired or necessary.

3. This court declined to review, under *State* v. *Golding* (213 Conn. 233), the defendant's unpreserved constitutional claim that the amount of visitation ordered by the trial court violated his fundamental parental rights under the due process clause of the fourteenth amendment, the record having been inadequate for such review: although the defendant filed various postjudgment motions in the trial court challenging its visitation order, he did not ask that court to reconsider the amount of visitation or to articulate the basis for that amount, or otherwise bring before the court the due process claim he raised on appeal, and, because the trial court never had the opportunity to rule on that issue, it was not preserved for review; moreover, given the inherently fact bound nature of how the trial court's visitation order should be implemented, the defendant's failure to request that the trial court make particularized findings as to the amount of visitation necessary to sustain the plaintiffs' relationship with B would render any decision by this court concerning the defendant's claim entirely speculative.

Argued September 10, 2018—officially released July 2, 2019

*Procedural History*

Petition for visitation with the defendant's minor child, brought to the Superior Court in the judicial

district of Windham and tried to the court, *Graziani, J.*; judgment granting the petition, from which the defendant appealed; thereafter, the court, *Graziani, J.*, denied the defendant's motion for an order precluding contact between the minor child and a third party; subsequently, the defendant, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest was involved, filed a separate appeal with this court, which consolidated the appeals; thereafter, the court, *Graziani, J.*, denied the defendant's motion to open and to terminate visitation, and the defendant's motion to dismiss, and the defendant, upon certification by the Chief Justice pursuant to § 52-265a that a matter of substantial public interest was involved, filed an amended appeal. *Affirmed.*

*Mathew Olkin*, for the appellant (defendant).

*Douglas T. Stearns*, for the appellees (plaintiffs).

*Justine Rakich-Kelly* and *Pamela Magnano* filed a brief for the Children's Law Center of Connecticut as amicus curiae.

*Leslie I. Jennings-Lax* and *Louise T. Truax* filed a brief for the Connecticut Chapter of the American Academy of Matrimonial Lawyers as amicus curiae.

*George Jepsen*, former attorney general, and *Carolyn A. Signorelli*, *Benjamin Zivyon* and *John E. Tucker*, assistant attorneys general, filed a brief for the Department of Children and Families as amicus curiae.

*Mark S. Randall* filed a brief for the Connecticut Bar Association as amicus curiae.

*Opinion*

ECKER, J. The principal issue in this appeal is whether an order granting a third party's petition for visitation pursuant to General Statutes § 46b-59[1] over the objection of a fit custodial parent must include a provision requiring the third party to abide by all of the parent's decisions regarding the care of the child during the visitation. We conclude that neither § 46b-59 nor the due process clause of the fourteenth amendment to the United States constitution requires the trial court to impose such a broad term and condition on an order of third-party visitation. With respect to the more limited claim of the custodial parent, the defendant James Gavis, that the denial of his postjudgment motion for a no contact order between the minor child and the child's maternal aunt violated the defendant's fundamental parental right to make decisions regarding his child's associations, we conclude that the defendant failed to meet his burden of demonstrating any such constitutional violation because he failed, as a threshold matter, to articulate a reason in support of the requested term and condition. We reject the defendant's remaining claims and affirm the judgment of the trial court.

I

The following facts and procedural history are relevant to this appeal. On November 3, 2016, the plaintiffs, Diane Boisvert and Thomas Boisvert,[2] filed a verified petition for visitation with their grandson, B,[3] pursuant to § 46b-59. The defendant, who is B's father, opposed the petition. The trial court, *Graziani, J.*, conducted an evidentiary hearing on the plaintiffs' petition, after which it issued a written memorandum of decision making the following findings of fact.

The defendant and Nicole M. Gavis (Nicole) were married in October, 2011, and divorced in July, 2013. They had one child, B, who was born in June, 2012. The defendant was "the primary cause of the breakdown of the marriage" because he subjected Nicole "to a course of domestic violence, threats and humiliation." (Internal quotation marks omitted.) As a consequence, "[t]he defendant has been in prison on seven different occasions with multiple incarcerations based [on] domestic violence . . . ." During his incarcerations, the defendant failed to provide any financial support for his family. After their divorce in 2013, Nicole was awarded sole custody of B, and the defendant had no visitation until April, 2015, at which time he was given supervised access to B. Nicole died on March 8, 2016.

The plaintiffs are B's maternal grandparents and, although they are divorced, they both have had a significant relationship with B since his birth. Prior to Nicole's death, her mother, Diane Boisvert, "provided [B with] care, including feeding, doctor appointments, taking [B] to day care, school appointments, taking day trips with

[B] as well as taking [B] on vacation." Thomas Boisvert's "role in taking care of [B] was less than that of" Diane Boisvert, but he still had a "significant relationship" with B, which "involved . . . babysitting, feeding and changing [B's] diapers."

The defendant was granted custody of B after Nicole's death in March, 2016. The plaintiffs continued to be involved in B's life until June 26, 2016,[4] when the defendant terminated the plaintiffs' contact with B because he believed that they were "seeking custody of [B] and [were] also seeking to get [the defendant] sent back to jail." The defendant claimed that the plaintiffs "did not follow his directions as to how they were to treat" B during their visits. For example, the defendant did not want B to use a pacifier, but the plaintiffs did not comply with his request. On another occasion, the defendant apparently did not want Diane Boisvert to assist B with his shoe, but she did so anyway.

At the evidentiary hearing on the plaintiffs' petition for visitation, Steven H. Humphrey, a licensed clinical psychologist, testified as an expert witness. Humphrey testified that the plaintiffs had been very involved as B's primary caretakers for twenty-two months of his young life while the defendant was incarcerated. In Humphrey's expert opinion, the plaintiffs both have a " 'warm and healthy bond' " with B, who has maintained a sense of their importance in his life. Humphrey explained that the sudden death of B's mother was "very traumatic . . . and severely disruptive and long lasting" for B and that the unexplained disappearance of the plaintiffs from B's life has compounded his sense of loss. Humphrey opined that the lack of contact between B and the plaintiffs "is very detrimental to [B] and would cause real and significant harm to [B]" if allowed to continue. Humphrey further testified that depriving B of "individuals who have been in a caretaker capacity, who have helped bridge the difficulties caused by maternal death and paternal incarceration, and who are capable and eager to provide [B] with such support, would not be in his best interest, and there are reasons for concern that there would be significant psychological harm to cessation of these relationship[s]." The trial court found Humphrey's in-court testimony, expert report, and expert opinions to be credible, "well thought out, appropriate, and reasonable."

Tracie Molinaro, the guardian ad litem appointed on behalf of B, also testified at the evidentiary hearing. In Molinaro's opinion, B has a "healthy relationship" with the plaintiffs, whom he "adores and loves . . . ." Molinaro testified that the plaintiffs had a regular and consistent relationship with B and that they had been actively involved in his day-to-day care, especially during the defendant's incarceration. Molinaro believed that B had a parent-like relationship with Diane Boisvert and that the denial of visitation would cause B real and signifi-

cant harm. As for Thomas Boisvert, Molinaro testified that the relationship was healthy, loving and positive, but she did not believe that the relationship rose to the level of a parent-like relationship. In Molinaro's opinion, neither of the plaintiffs would undermine the defendant's role as a parent if visitation was ordered. The trial court found Molinaro's testimony to be "credible and consistent with the testimony of . . . Humphrey, with the exception of the maternal grandfather not having a parent-like relationship" with B, which the trial court did not find to be correct.

The trial court issued its written memorandum of decision on August 11, 2017. On the basis of the evidence adduced at the evidentiary hearing, the trial court found, by clear and convincing evidence, that the plaintiffs had a parent-like relationship with B and that a denial of visitation would cause B real and significant harm. The trial court explained: "This child is five years old. During his life, he has suffered the loss of his father as a result of his incarceration for approximately two years, being 40 percent of the child's life. [After] [t]he death of his mother on March 8, 2016, the cessation of any meaningful contact with his maternal grandparents for the last year as a result of the unilateral actions of the father is clearly harmful to the child. As . . . Humphrey articulated in his testimony and report, the death of the child's mother, compounded with the unexplained disappearance of the maternal grandparents, is very detrimental to the child and would cause real and significant harm to the child. . . . Humphrey also opined that disruptive relationships in the life of a child can have deleterious effects for the child, including mood problems, insecurity and problems with socialization and self-confidence. The death of the mother cannot be changed. The cessation of the child's contact with the maternal grandparents can be changed by the court. The father, in terminating a support for the child in the form of . . . consistent and loving figures in the life of the child, the maternal grandparents, is not acting in the best interest of the child. Contact with the child's mother's family provides a source of information to the child as to the mother that he no longer gets to see by virtue of her death. The emotional development of the child in dealing with the loss of his mother and the cessation of contact with the maternal grandparents clearly is harmful to the child and not in the best interest of the child. The court thereby, having found the existence of a parent-like relationship between the child and the maternal grandparents, also finds that the termination of that relationship does cause a real and significant harm to the child."

The trial court granted the plaintiffs' petition for visitation, awarding Diane Boisvert visitation "every other weekend from Friday at 5 p.m. until Sunday at 5 p.m.," and Thomas Boisvert visitation "every Wednesday from the end of school each Wednesday, or noon if there is

no school, until 8 p.m." The trial court also imposed the following terms and conditions on visitation: (1) "[t]he parties shall not disparage the other parties in the presence of the minor child"; (2) "[a]ll communication between the parties regarding visitation and/or the minor child shall be via text message or other written communication"; and (3) "[n]othing herein shall prohibit the parties [from] expanding the visitation for any specific visit as agreed by [the] parties in writing by the parties."

The defendant filed an appeal from the trial court's judgment. Shortly thereafter, the defendant also filed a postjudgment motion for order, pursuant to Practice Book § 25-24 (a), asking the trial court to enter an order requiring the plaintiffs to "allow no contact between [the] minor child [B] and a certain third party, Regina Riddell . . . ."[5] The defendant represented in his motion that he had "asked the plaintiffs to allow no contact between the minor child and . . . Riddell but that the plaintiffs ha[d] refused to give assurance that they [would] honor such request." The defendant argued that the plaintiffs' refusal to honor his request constituted a denial of his fundamental parental right to make decisions regarding B's care, control and associations. The trial court conducted a hearing on the defendant's motion at which the plaintiffs' counsel explained that the defendant's motion "stems from . . . Diane Boisvert, having her daughter living in her house, her daughter [Riddell] . . . is an adult, and it stems from the request that [Riddell] not be present for any of the visitation." The plaintiffs' counsel continued: "[T]here have been no documented concerns of any harm that would come to the child from [Riddell]. This was never brought up during the trial about [Riddell's] presence being a concern. And so this seems like an unreasonable request . . . ." The defendant did not testify at the hearing and presented no evidence in support of his motion. The trial court denied the defendant's postjudgment motion on the ground that there was "not one scintilla of evidence to show that [B's contact with Riddell] is inappropriate, puts the child in any danger, or reduces the level of care." The trial court noted that "visitation is always an open issue, it's never cast in stone," and, if an order of visitation puts a child at risk or is not in a child's best interest, "then the court can always modify or terminate the visitation . . . ." The trial court explained, however, that it was not otherwise "going to micromanage" the visitation because "[there are] literally millions and millions of circumstances that may ultimately follow . . . ."

The defendant subsequently filed a motion to reargue, contending that "it was irrelevant that the defendant failed to produce evidence to show the child could be harmed if the defendant's decisions were not complied with" because the defendant is a fit parent whose decisions must be presumed to be in the best interest of his

child. The defendant argued that "[t]he constitutional limitations [that] constrain the *granting* of third-party visitation orders necessarily apply with equal force to the terms and conditions of the visitation order itself," and, as such, the trial court is obligated to "craft orders [that] preserve, to the extent possible, a parent's fundamental right to make parenting decisions." (Emphasis in original.) The trial court denied the defendant's motion to reargue.

The defendant then filed an application for an expedited public interest appeal from the trial court's denial of his postjudgment motions pursuant to General Statutes § 52-265a and Practice Book § 83-1. He contended that the trial court's failure to direct the plaintiffs to abide by his parental decisions regarding the care, control and custody of B violates § 46b-59 and the due process clause of the fourteenth amendment to the United States constitution. The application was granted by then Chief Justice Rogers. Thereafter, the defendant's direct appeal was transferred from the Appellate Court to this court pursuant to Practice Book § 65-1, and his direct appeal and his certified public interest appeal were consolidated for this court's review.

While these appeals were pending, on January 9, 2018, the defendant filed in the trial court a postjudgment motion to open and terminate visitation, claiming that a change in circumstances had divested the trial court of subject matter jurisdiction. The defendant informed the trial court that he had offered each of the plaintiffs what he considered to be meaningful visitation in the amount of a four hour visit each month plus a four hour visit on or near a major holiday, and argued that, in light of this offer, the trial court was divested of jurisdiction because there no longer was a denial of visitation that would cause real and significant harm to B under § 46b-59 (b). Two months later, on March 22, 2018, the plaintiffs filed a motion for contempt in the trial court, alleging that the defendant had refused to comply with the third-party visitation order on the basis of his offer of visitation, which "is very limited and outside of any court orders." The defendant moved to dismiss the motion for contempt for lack of subject matter jurisdiction. The trial court denied the defendant's postjudgment motion to open and terminate visitation, determining that the defendant's unilateral offer of visitation did not divest the trial court of "subject matter jurisdiction over the action at the time it rendered the underlying judgment and issued its memorandum of decision."

The trial court held a hearing on the plaintiffs' motion for contempt on July 18, 2018. On the morning of the hearing, the defendant filed a postjudgment motion to dismiss for lack of subject matter jurisdiction, again contending that his January 9, 2018 offer of visitation had divested the trial court of subject matter jurisdiction. At the hearing, the defendant argued that "nothing

can be adjudicated today because of the motion I filed this morning seeking dismissal for a lack of subject matter jurisdiction." The trial court denied the defendant's motion to dismiss for lack of subject matter jurisdiction and also denied his motion to dismiss the plaintiffs' motion for contempt. On the merits of the contempt motion, the trial court heard testimony that court-ordered visitation had been refused for four months, which is "sixteen days of weekends, plus every single Wednesday . . . ." On the basis of the evidence adduced at the hearing, the trial court found the defendant to be "in wilful contempt by clear and convincing evidence of the August 11, 2017 court orders and enter[ed] the following remedial orders: (1) The defendant shall pay the plaintiffs' [attorney's] fees in the amount of $1400. This amount shall be paid within thirty days. (2) The visitation which was previously ordered on August 11, 2017, shall resume immediately. The maternal grandmother's weekend visitation shall commence on July 20, 2018, and the maternal grandfather's Wednesday visitation shall commence on July 25, 2018. (3) In addition to the previously ordered visitation, the maternal grandmother shall have five days of continuous visitation with the minor child this summer. The dates shall be selected upon agreement of the parties. If the parties are unable to come to an agreement, the maternal grandmother shall have visitation with the minor child from August 13, 2018, through August 17, 2018."

On July 23, 2018, the plaintiffs filed a second motion for contempt, alleging that the defendant had "again refused visitation," even after being "ordered to resume visitation after being found in contempt . . . ." The trial court conducted a hearing at which the plaintiffs testified that the defendant continued to refuse to permit them any visitation with B, despite the trial court's prior orders. Following the hearing, the trial court found, by clear and convincing evidence, that "the defendant had notice of the valid court orders both on August 11, 2017, and the subsequent court order of July 19, 2018," and had "wilfully failed to comply with the orders of the court, which are clear and unambiguous, by not providing the visitation in accordance with the court orders with the plaintiff Diane Boisvert [from] July 20 through [July] 22 of 2018, and the plaintiff Thomas Boisvert on July 25, 2018." The court found the defendant to be in wilful contempt and committed him to the custody of the Department of Correction. The trial court stayed its order of incarceration, however, pending compliance with the court's order of visitation.[6]

The defendant filed an amended appeal in this court seeking review of the trial court's July 19, 2018 contempt order and the denial of his postjudgment motion to dismiss for lack of subject matter jurisdiction. The defendant's amended appeal was treated as an application for certification to file a public interest appeal

pursuant to § 52-265a and Practice Book § 83-1, which was granted by Chief Justice Robinson. Thereafter, the parties filed supplemental briefs addressing the trial court's subject matter jurisdiction and the validity of the contempt order.

The defendant raises the following claims in these consolidated appeals: (1) the trial court improperly denied the defendant's postjudgment motion to dismiss for lack of subject matter jurisdiction because it failed to make the requisite factual findings under *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002); (2) the trial court's July 19, 2018 order of contempt is void for lack of subject matter jurisdiction; (3) the order of visitation violates the implicit requirements of § 46b-59 and the due process clause of the fourteenth amendment because it does not include, as a term and condition governing the visitation, a provision affirmatively directing the plaintiffs to abide by the defendant's decisions regarding B's care; (4) the order of visitation violates the defendant's fundamental parental rights under the due process clause because the amount of visitation is more than is necessary to further the state's compelling interest in sustaining B's relationship with the plaintiffs; and (5) the "magnitude as well as the duration of the constitutional deprivations" warrant vacatur of the order of visitation and dismissal of the plaintiffs' petition for visitation.[7]

## II

It will be useful at the outset to review the fundamental constitutional principles and relevant statutory provisions governing third-party visitation. A parent's right to control his or her child's upbringing was first accorded constitutional protection in two United States Supreme Court cases decided almost one century ago. See *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (referring to "the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (referring to parent's right to "bring up children"). Seventy-five years later, in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the United States Supreme Court had occasion to consider whether this parental right was violated by Washington's third-party visitation statute, which permitted " '[a]ny person' to petition a superior court for visitation rights 'at any time,' and authorize[d] that court to grant such visitation rights whenever 'visitation may serve the best interest of the child.' " Id., 60 (plurality opinion), quoting Wash. Rev. Code § 26.10.160 (3) (2000). Pursuant to the Washington statute, Jenifer and Gary Troxel were granted visitation with their granddaughters over the objection of their mother, Tommie Granville. Id., 60–61. The United States Supreme Court held that the order of visitation infringed on Granville's fundamental

right under the due process clause of the fourteenth amendment of the United States constitution to "make decisions concerning the care, custody, and control of her two daughters." Id., 72. The court noted that "[t]he Washington nonparental visitation statute [was] breathtakingly broad"; id., 67; and "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." Id., 69. Because the due process clause "does not permit a [s]tate to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made," the court held that Washington's third-party visitation statute was unconstitutional. Id., 72–73. In arriving at its conclusion, the court noted that it did not need to "define . . . the precise scope of the parental due process right in the visitation context" because "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied . . . ." Id., 73. In short, "the constitutional protections in this area are best 'elaborated with care.' " Id.[8]

In *Roth* v. *Weston*, supra, 259 Conn. 205, this court considered whether Connecticut's then existing third-party visitation statute, General Statutes (Rev. to 2001) § 46b-59, was unconstitutional in light of *Troxel*. We acknowledged in *Roth* that parents have a fundamental constitutional right "to raise their children as they see fit," and "*Troxel* teaches that courts must presume that fit parents act in the best interests of their children . . . ." (Internal quotation marks omitted.) Id., 216, quoting *Troxel* v. *Granville*, supra, 530 U.S. 68 (plurality opinion). "*Troxel* confirms that among those interests lying at the core of a parent's right to care for his or her own children is the right to control their associations. . . . The essence of parenthood is the companionship of the child and the right to make decisions regarding his or her care, control, education, health, religion and association[s]." (Citation omitted.) *Roth* v. *Weston*, supra, 216–17.

*Roth* also recognized, however, that there are "limitations on these parental rights." Id., 224. One such limitation occurs when an otherwise fit parent denies his or her child access to an individual who has a parent-like relationship with the child and "the parent's decision regarding visitation will cause the child to suffer real and substantial emotional harm . . . ."[9] Id., 226. Under such circumstances, the state has a compelling interest in protecting "the child's own complementary interest in preserving [parent-like] relationships that serve [the child's] welfare" by avoiding the "serious and immediate harm to [the] child" that would result from the parent's decision to terminate or impair the child's relationship with the third party. Id., 225; see also id. ("[The] issue of grandparent visitation is not simply 'a bipolar struggle between the parents and the [s]tate over who has final authority to determine what is in a child's best

interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child.' "), quoting *Troxel* v. *Granville*, supra, 530 U.S. 86 (Stevens, J., dissenting). *Roth* holds that a third party seeking visitation over a fit parent's objection must surmount a "high hurdle"; *Roth* v. *Weston*, supra, 229; and requires the petitioning party to establish, by clear and convincing evidence, that (1) a parent-like relationship exists, and (2) denial of visitation would cause the child to suffer real and significant harm. Id., 225–29. These two factors, commonly referred to as the *Roth* factors, "must be satisfied in order for a court: (1) to have jurisdiction over a petition for visitation contrary to the wishes of a fit parent; and (2) to grant such a petition." Id., 234. Once this high burden is met, visitation "is appropriate and should be ordered." *DiGiovanna* v. *St. George*, 300 Conn. 59, 73, 12 A.3d 900 (2011).

In 2012, our legislature amended § 46b-59 in accordance with the constitutional standards set forth in *Roth*. See Public Acts 2012, No. 12-137, § 1 (P.A. 12-137). The amended statute provides that "[a]ny person may submit a verified petition to the Superior Court for the right of visitation with any minor child. Such petition shall include specific and good-faith allegations that (1) a parent-like relationship exists between the person and the minor child, and (2) denial of visitation would cause real and significant harm. Subject to subsection (e) of this section, the court shall grant the right of visitation with any minor child to any person if the court finds after hearing and by clear and convincing evidence that a parent-like relationship exists between the person and the minor child and denial of visitation would cause real and significant harm."[10] General Statutes § 46b-59 (b). "In determining whether a parent-like relationship exists . . . the Superior Court may consider, but shall not be limited to, the following factors: (1) The existence and length of a relationship between the person and the minor child prior to the submission of a petition pursuant to this section; (2) The length of time that the relationship between the person and the minor child has been disrupted; (3) The specific parent-like activities of the person seeking visitation toward the minor child; (4) Any evidence that the person seeking visitation has unreasonably undermined the authority and discretion of the custodial parent; (5) The significant absence of a parent from the life of a minor child; (6) The death of one of the minor child's parents; (7) The physical separation of the parents of the minor child; (8) The fitness of the person seeking visitation; and (9) The fitness of the custodial parent." General Statutes § 46b-59 (c). Additionally, if the third party seeking visitation is a grandparent, the trial court may consider "the history of regular contact and proof of a close and substantial relationship between the grandparent and the minor child." General Statutes § 46b-

59 (d).

Section 46b-59 (e) provides in relevant part that a trial court granting visitation "shall set forth the terms and conditions of visitation including, but not limited to, the schedule of visitation, including the dates or days, time and place or places in which the visitation can occur, whether overnight visitation will be allowed and any other terms and conditions that the court determines are in the best interest of the minor child, provided such conditions shall not be contingent upon any order of financial support by the court. In determining the best interest of the minor child, the court shall consider the wishes of the minor child if such minor child is of sufficient age and capable of forming an intelligent opinion. In determining the terms and conditions of visitation, the court may consider . . . the effect that such visitation will have on the relationship between the parents or guardians of the minor child and the minor child . . . ." The statute also makes clear that a grant of visitation does not create any "parental rights in the person or persons to whom such visitation rights are granted . . . ." General Statutes § 46b-59 (f).

In *DiGiovanna* v. *St. George*, supra, 300 Conn. 73, we specifically addressed the trial court's authority to fashion terms and conditions governing third-party visitation. In that case, the plaintiff sought visitation with the child over the mother's intense objection. Id., 61–62, 65. The mother's opposition to third-party visitation was so vehement and unrestrained that, even though the trial court found by clear and convincing evidence that both of the *Roth* factors had been satisfied, the trial court nonetheless denied the plaintiff's petition for visitation because it believed that the mother would take her anger out on the child and, on that basis, concluded that visitation ultimately was not in the child's best interest. Id., 67. This court reversed the judgment of the trial court, explaining that the best interest of the child standard cannot "overcome the *Roth* standard for ordering visitation." Id., 69. We clarified that the best interest of the child standard "determines *how* [an] order of visitation should be implemented"; (emphasis in original) id., 73; and the trial court has many "tools in its arsenal to effectuate visitation." Id., 75. For example, the trial court has authority under General Statutes § 46b-56 (i) to order both parents and third parties to undergo counseling; id., 74–75; and can "[prescribe] specific conditions under which visitation would take place to address legitimate concerns of either party." Id., 75. With specific reference to the mother's concern that "the plaintiff had attempted to buy the [child's] affections by excessively spending money on [him] and buying [him] toys and gifts," we observed that the trial court "could have limited the circumstances under which the plaintiff could buy things for" the child. Id., 75 n.8. We noted, finally, that the trial court can always use "its contempt powers to coerce . . . compliance"

with visitation orders and may even "consider whether to order intervention by the [D]epartment [of Children and Families]." Id., 76. *DiGiovanna* clarifies that the best interest of the child standard "guides the court in determining how best to foster" the relationship between the third party and the child once visitation is ordered under the *Roth* factors, as codified in § 46b-59, and the trial court may, in implementing the visitation order, consider "counseling, as well as restrictions on the time, place, manner, and extent of visitation." Id., 78.

III

With this legal framework in mind, we turn to the defendant's claims on appeal. A threshold issue involves the defendant's challenge to the trial court's subject matter jurisdiction. The jurisdictional attack is predicated on the defendant's postjudgment offer of visitation to the plaintiffs, which was conveyed to the plaintiffs by letter dated January 9, 2018. The defendant argued in the trial court that this postjudgment offer of visitation deprived the court of subject matter jurisdiction over the action because there no longer was a "denial of visitation" that "would cause real and significant harm." General Statutes § 46b-59 (b); see also *Roth* v. *Weston*, supra, 259 Conn. 234 (holding that both *Roth* factors "must be satisfied in order for a court . . . to have jurisdiction over a petition for visitation contrary to the wishes of a fit parent"). The defendant acknowledged that the trial court may have "*previously* . . . possessed subject matter jurisdiction over this action" because there was a complete denial of visitation when the trial court granted the plaintiffs' petition for visitation, but contended that his subsequent "offer of meaningful visitation serves to deprive [the] court of jurisdiction over this action *presently*." (Emphasis in original.) He renews this claim on appeal.

The defendant's argument is predicated on *Denardo* v. *Bergamo*, 272 Conn. 500, 509, 863 A.2d 686 (2005), which he contends requires application of the *Roth* factors to a postjudgment motion to dismiss filed by a fit parent.[11] The defendant's reliance on *Denardo* is misplaced, however, because *Denardo* involved an award of third-party visitation that was not supported by the *Roth* factors in the first instance. See id., 503. In *Denardo*, the trial court's initial order granting visitation to the paternal grandparents, over the mother's objection, was made prior to this court's decision in *Roth*. Id., 505–506. The trial court therefore based its initial ruling on the "best interest of the child standard [which at the time] was in accord with the judicial gloss that this court had applied to [the pre-*Roth* version of] § 46b-59 . . . ." Id., 506. After our decision in *Roth* was issued, the defendant in *Denardo* moved to modify and terminate the third-party visitation order on the ground that the standard articulated in *Roth* applied retrospec-

tively. Id., 507. The trial court agreed, and this court affirmed, stating: "The plaintiffs failed to allege or attempt to prove that their relationship with the child was similar to a parent-child relationship and that denial of visitation would cause real and significant harm to the child. Without those specific, good faith allegations or such proof, either at the time of the filing of their petition or at the time of the hearing on the defendant's motion, the trial court's prior order of visitation was rendered without subject matter jurisdiction." Id., 514. Although *Denardo* held that the *Roth* factors apply retroactively to third-party visitation orders issued under the pre-*Roth* best interest of the child standard, that case says nothing about the jurisdiction of a trial court to adjudicate a postjudgment motion to dismiss on the basis of events that occur after an award of third-party visitation is made by a court duly applying the *Roth* factors under § 46b-59, as amended by P.A. 12-137. *Denardo*, therefore, lends no support to the defendant's jurisdictional claim.

The defendant's jurisdictional argument is not cast in terms of mootness, but he appears to argue that his postjudgment offer of visitation rendered the action moot because he voluntarily remedied any legally cognizable harm. "Mootness implicates [the] court's subject matter jurisdiction" and, therefore, "presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 506–507, 970 A.2d 578 (2009). "Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because a change in the condition of affairs between the parties. . . . A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists" and "the court can no longer grant any practical relief." (Internal quotation marks omitted.) *Taylor* v. *Zoning Board of Appeals*, 71 Conn. App. 43, 46, 800 A.2d 641 (2002).

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a . . . court of its power to determine the legality of the practice," because, "[i]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways." (Internal quotation marks omitted.) *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). The voluntary cessation exception to the mootness doctrine is founded on "the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc.* v. *Waukesha*, 531 U.S. 278, 284 n.1, 121 S. Ct. 743, 148 L. Ed. 2d 757 (2001). Thus, the standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent," and a case becomes

moot only "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (Internal quotation marks omitted.) *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, supra, 189. "The heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (Internal quotation marks omitted.) Id.; see also *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 281, 933 A.2d 256 (2007) (holding that defendant's voluntary cessation of challenged activity did not render case moot because defendant had "not alleged, much less established, that it does not intend to resume" challenged activity).

Even if we were to assume, for the sake of argument, that a controversy involving an existing order of third-party visitation could be rendered moot under some circumstances due to the custodial parent's voluntary offer to allow meaningful visitation, the defendant has failed to satisfy his heavy burden of establishing that his January 9, 2018 offer of visitation was made in good faith and with the intention to permit the plaintiffs to visit with B, rather than to avoid or undermine the purpose of the third-party visitation order. The record reflects that the defendant consistently and vehemently has opposed the plaintiffs' visitation with B. Indeed, the defendant's opposition to the plaintiffs' visitation is so intense that he has refused to comply with court-ordered visitation for months at a time and twice has been found to be in contempt of court, resulting in an order of commitment to the Department of Correction. The defendant's voluntary offer of visitation, on these facts, plainly did not divest the trial court of subject matter jurisdiction.

Our conclusion on this point also disposes of the defendant's claim that the trial court's July 19, 2018 order of contempt was void for lack of subject matter jurisdiction. Having determined that the trial court had subject matter jurisdiction over this matter, we hold that the defendant's challenge to the contempt order must fail. See *Eldridge* v. *Eldridge*, 244 Conn. 523, 530, 710 A.2d 757 (1998) ("[a]n order of the court must be obeyed until it has been modified or successfully challenged" [internal quotation marks omitted]). Therefore, the trial court's July 19, 2018 order of contempt is affirmed.

IV

The defendant claims that the trial court's order of visitation violated the implicit requirements of § 46b-59 and the due process clause of the fourteenth amendment to the United States constitution because it failed to include a provision affirmatively directing the plaintiffs to abide by his decisions regarding B's care during the duration of their visit with B. It is important to

understand at the outset that the defendant does not challenge the trial court's *Roth* findings or the award of visitation in favor of the plaintiffs. He contends, instead, that the third-party visitation order is unlawful because both § 46b-59 and the due process clause require a trial court granting third-party visitation to "affirmatively [direct] the third party not to override the parent's decisions concerning the minor child's care, control, education, health, religion, and associations." (Emphasis omitted.) We disagree.

A

We first address defendant's claim regarding the implicit requirements of § 46b-59. "[I]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Ugrin* v. *Cheshire*, 307 Conn. 364, 379–80, 54 A.3d 532 (2012).

Section 46b-59 (e) expressly addresses the terms and conditions governing a third-party visitation order. It provides: "If the Superior Court grants the right of visitation pursuant to subsection (b) of this section, the court shall set forth the terms and conditions of visitation including, but not limited to, the schedule of visitation, including the dates or days, time and place or places in which the visitation can occur, whether overnight visitation will be allowed and any other terms and conditions that the court determines are in the best interest of the minor child . . . . In determining the best interest of the minor child, the court shall consider the wishes of the minor child if such minor child is of sufficient age and capable of forming an intelligent opinion. In determining the terms and conditions of visitation, the court may consider (1) the effect that such visitation will have on the relationship between the parents or guardians of the minor child and the minor child, and (2) the effect on the minor child of any domestic violence that has occurred between or among parents, grandparents, persons seeking visitation and the

minor child." General Statutes § 46b-59 (e).

Nothing in § 46b-59 requires the trial court to include, as a term and condition governing the order of third-party visitation, a provision affirmatively directing the third party not to override a fit parent's decisions regarding the child's care. To the contrary, the statute plainly provides the trial court with the authority to craft "terms and conditions that the court determines are in the best interest of the minor child . . . ." General Statutes § 46b-59 (e); see also *DiGiovanna* v. *St. George*, supra, 300 Conn. 73 (clarifying "that the best interest of the child determines *how* th[e] order of visitation should be implemented" [emphasis in original]). We therefore reject the defendant's statutory argument.

### B

The defendant next argues that the due process clause of the fourteenth amendment compels a trial court ordering third-party visitation to include a provision requiring the third party to abide by all of a fit parent's decisions regarding the child's care during the visitation. This claim is based on the "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel* v. *Granville*, supra, 530 U.S. 69 (plurality opinion); see also *Roth* v. *Weston*, supra, 259 Conn. 221. In light of this traditional presumption, the defendant contends that § 46b-59 is unconstitutional as applied to the facts of this case because the trial court's visitation order permits the plaintiffs to override the defendant's exercise of his fundamental parental right to make decisions regarding B's care.

"Determining the constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405, 119 A.3d 462 (2015). In evaluating the constitutionality of a statute, moreover, we will construe the statute in such a manner as "to save its constitutionality," rather than "to destroy it." *State* v. *Indrisano*, 228 Conn. 795, 805, 640 A.2d 986 (1994). In doing so, "we may also add interpretative gloss to a challenged statute in order to render it constitutional. In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted). Id., 805–806.

The due process clause of the fourteenth amendment requires a court to apply the "traditional presumption that a fit parent will act in the best interest of his or her child"; *Troxel* v. *Granville*, supra, 530 U.S. 69 (plurality opinion); see also *Roth* v. *Weston*, supra, 259 Conn. 221; and to accord "special weight" to a fit parent's determination of his or her child's best interest. *Troxel* v. *Granville*, supra, 69. Indeed, it is because of this constitutional deference to a fit parent's decision-making authority that § 46b-59 contains an implicit but "rebuttable presumption that visitation that is opposed by a fit parent is not in a child's best interest." *Roth* v. *Weston*, supra, 234. In order to obtain an order of visitation over a fit parent's objection, a third party must surmount a "high hurdle" and demonstrate, by clear and convincing evidence, both that a parent-like relationship exists and that disruption of the third-party relationship would cause the child to suffer real and significant harm. Id., 229. Once this high hurdle has been surmounted, however, and the trial court orders third-party visitation over a fit parent's objection, the "traditional presumption" relied on by the defendant has been rebutted with respect to whether visitation is in the child's best interest. Stated another way, once there has been a judicial determination that a parent's denial of visitation would cause the child to suffer real and significant harm, then it no longer can be presumed that a fit parent is acting in his or her child's best interest in connection with the third-party visitation. The *Roth* standard itself is built on the premise that judicial intervention is warranted precisely because the interactions between an otherwise fit parent and a third party seeking visitation can be so fraught with hostility, tension, and resentment—often for reasons unrelated to the child—that the parent is unable or unwilling to act in the child's best interest, resulting in real and significant harm to the child.[12]

None of this means that a fit parent who is subject to a third-party visitation order has forfeited his or her parental rights or that the third party has obtained parental rights by virtue of the order of visitation. A fit parent retains the "quintessential rights of parenthood," which "include the right to make medical, educational, religious and other decisions that affect the most fundamental aspects of the child's life . . . ." (Internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 58, 939 A.2d 1040 (2008). Likewise, § 46b-59 (f) explicitly provides that "[v]isitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted . . . ." These precepts remain fixed and unchanged, but they do not confer on the parent an absolute right to dictate the terms and conditions governing the visitation. The animating purpose of the statute is to sustain and nurture the deep, emotional bond between the child and the third

party, and the third party's caregiving choices for the child while acting in a "parent-like" capacity necessarily are integral to the formation and sustenance of that bond—a bond that the trial court has determined must be preserved to prevent real and significant harm to the child. The fundamental purpose of the statute would be thwarted if the parent opposing third-party visitation were given unfettered authority to micromanage the visitation and to replace the third party's caregiving choices during the period of visitation with his or her own.

We recognize that, during the course of the child's visitation with the third party, the third party may make decisions for the child that potentially implicate a parent's fundamental parental rights to direct his or her child's upbringing, and the longer the period of visitation, the more decisions that the third party must make. See *Roth* v. *Weston*, supra, 259 Conn. 229 n.13 (recognizing that "[v]isitation is a limited form of custody during the time the visitation rights are being exercised" [internal quotation marks omitted]). Most of the third party's decisions during visitation will be of the mundane variety, and, less frequently, the third party may need to make weighty, discretionary, and sometimes instantaneous decisions pertaining to the child's health, safety, and well-being. The question we must resolve in the present appeal is, when a conflict arises between a fit parent and a third party regarding the third party's caregiving decisions that implicate the parent's constitutional rights, how should that conflict be resolved so as to preserve the parent's rights, while at the same time sustaining the child's relationship with the third party?

To answer this question, we turn to § 46b-59 (e), which provides the trial court with the authority to devise terms and conditions governing third-party visitation. Section 46b-59 (e) provides in relevant part that if visitation is granted, "the court shall set forth the terms and conditions of visitation including, but not limited to, the schedule of visitation, including the dates or days, time and place or places in which the visitation can occur, whether overnight visitation will be allowed and any other terms and conditions that the court determines are in the best interest of the minor child . . . . In determining the best interest of the minor child, the court shall consider the wishes of the minor child if such minor child is of sufficient age and capable of forming an intelligent opinion. In determining the terms and conditions of visitation, the court may consider . . . *the effect that such visitation will have on the relationship between the parents or guardians of the minor child and the minor child . . . .*" (Emphasis added.) General Statutes § 46b-59 (e) (1). Thus, in setting forth terms and conditions governing the order of third-party visitation, the trial court can and should consider the effect that the visitation order will have on the parent-child relationship, which include any

good faith concerns that the parent might have regarding the third party's caregiving choices and how those choices may infringe on the parent's fundamental rights relating to the child's upbringing. The statute therefore provides the trial court with the ability to craft particularized terms and conditions to protect the parental prerogatives at the heart of the parent-child relationship while simultaneously preserving the constitutive elements of a meaningful third-party visitation.

In assessing what terms and conditions may be in the "best interest of the minor child" under § 46b-59 (e), the trial court must accord "special weight" to a fit parent's preferences; *Troxel* v. *Granville*, supra, 530 U.S. 69 (plurality opinion); when those preferences pertain to the most fundamental aspects of the child's life, such as the child's "education, health, religion, and association." *Roth* v. *Weston*, supra, 259 Conn. 217; see also *Fish* v. *Fish*, supra, 285 Conn. 58 (describing parent's "right to make medical, educational, religious and other decisions that affect the most fundamental aspects of the child's life during the custodial period"). When it comes to these particular matters, properly tailored parental requests made in good faith should not be rejected by the trial court solely on the basis of the third party's conflicting views or the "judge's [own] personal or lifestyle preferences." *Fish* v. *Fish*, supra, 47. For example, if a parent requests as a term and condition of visitation an order prohibiting the third party from taking the child to religious services in the third party's faith because the child is being raised in a different faith (or no faith at all), the trial court should not deny this parental request because he or she (or the third party) believes that the child would benefit from exposure to the other religion. If made in good faith, these types of parental requests, which affect "the most fundamental aspects of the child's life"; id., 58; are not subject to judicial override under color of an order of third-party visitation. See General Statutes § 46b-59 (f).

Two caveats are necessary. First, many decisions do not fall within the scope of this category of fundamental parental prerogative, and, with respect to those matters, the trial court has discretion under the statute to formulate terms and conditions that serve the best interest of the child. In doing so, the trial court always should take into account the fit parent's good faith preferences, but those preferences are not entitled to "special weight" under the due process clause of the fourteenth amendment. See *Troxel* v. *Granville*, supra, 530 U.S. 69 (plurality opinion); *Roth* v. *Weston*, supra, 259 Conn. 217. Second, even in the realm of decisionmaking involving those matters that affect the most fundamental aspects of a child's upbringing, the trial court should satisfy itself that the parental request is made in good faith before according it the special weight the constitution requires. A good faith inquiry is necessary because

the relationship between the parent and the third party may be so toxic, and the parent's opposition to the visitation may be so vehement, that the parent may try to undermine the third-party visitation by imposing unreasonable and unfounded terms and conditions. See *DiGiovanna* v. *St. George*, supra, 300 Conn. 78 (declining to create loophole by which recalcitrant parent may thwart intent of third-party visitation statute). By way of example, perhaps the third party and the child always have shared a special interest in baseball, and the parent requests an order preventing the third party from taking the child to baseball games or playing baseball with the child out of an alleged concern for the child's health and safety due to the risk of harm. The third party objects and questions the good faith nature of the parental request, in light of the undisputed fact that the parent allows the child to play baseball at all other times. After considering the facts and the parties' explanations, the trial court may deny the requested term and condition, even though it allegedly implicates a fundamental parental right, if the trial court finds that the parental request represents a bad faith attempt to undermine the third-party relationship.

We can hypothesize an infinite variety of factual scenarios and a limitless number of parental and third-party motivations that may require judicial resolution, depending on the facts and circumstances of each individual case.[13] Given the depth and complexity of the issues involved, we believe that the trial court is in the best position to "[prescribe] specific conditions under which visitation [should] take place to address legitimate concerns of either party." *DiGiovanna* v. *St. George*, supra, 300 Conn. 75.

The present case illustrates the need for the parties to follow certain commonsense procedures to provide an optimal framework for the trial court to determine what terms and conditions may be necessary under § 46b-59 (e). A party seeking to impose terms and conditions on the order of visitation must make a *specific* and *timely* request. A request is specific if it is tailored to identify and ameliorate the party's concern and is accompanied by an explanation of how the requested terms and conditions further the best interest of the child. See General Statutes § 46b-59 (e) ("terms and conditions that the court determines are in the best interest of the minor child"). If the requesting party is a parent who believes that the requested terms and conditions are necessary to protect his or her fundamental parental rights, the parent must alert the trial court to the alleged constitutional nature of the request and the right asserted. See General Statutes § 46b-59 (f) ("[t]he grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon . . . the parental rights with respect to such child"). The explanation provided to the trial court need not be exhaustive, but it should be sufficient to

alert the trial court to the content and contours of the requesting party's claim.[14] The required explanation, and the reasons for any opposition, ordinarily will be based on the evidence elicited during the hearing on the contested petition for visitation. If additional evidence is needed, an evidentiary hearing will be necessary to enable the trial court to make the factual determinations and credibility assessments required for a decision. The evidence not only will enable the trial court to decide whether the requested terms and conditions are made in good faith, but also will allow the trial court to weigh the competing considerations and determine whether it is possible to fashion terms and conditions that may accommodate competing interests, wishes, and needs.

A request is timely if it is made without unreasonable delay once the requesting party knows or reasonably should know of the factual circumstances that prompt the requested terms and conditions. The requesting party is not barred from belatedly requesting such terms and conditions in a postjudgment motion, as was done in this case, but the belated nature of the request may support an inference that it is not made in good faith, if the inference reasonably is justified under the surrounding circumstances. The requirements of specificity and timeliness are not intended to preclude good faith requests for reasonable terms and conditions that may arise as circumstances develop over time, but to provide an optimal and efficient procedure by which the trial court can evaluate the requested terms and conditions and fashion appropriate relief responsive to the parties' concerns and the child's needs.

Ultimately it is up to the trial court, as the finder of fact and the arbiter of credibility, to determine the issues relating to the terms and conditions of visitation, including, without limitation, whether the requested terms and conditions reflect a parent's sincerely held belief regarding a fundamental aspect of the child's upbringing or whether they are a pretext to undermine the third-party relationship or the order of visitation. The trial court has many "tools in its arsenal" to protect a fit parent's fundamental rights while simultaneously fostering the third-party relationship by effectuating the order of visitation. *DiGiovanna* v. *St. George*, supra, 300 Conn. 75, 78; see General Statutes § 46b-56.

Applying these principles to the facts of this case, we conclude that the trial court properly denied the defendant's request for a broad order requiring the plaintiffs to abide by all of his parental decisions regarding B's care during the course of the plaintiffs' visitation. The defendant's motion was untimely because it was filed after the close of evidence and the issuance of the trial court's order of third-party visitation. Moreover, for the reasons previously explained, the due process clause of the fourteenth amendment does not require

the trial court to issue a broad order requiring a third party to abide by *all* of a parent's decisions regarding the child's care, regardless of the nature of the parent's decisions, the reasons for the request, whether the decisions further the child's best interest, and whether they implicate the parent's constitutional right to guide his or her child's upbringing. As the United States Supreme Court has cautioned, "the constitutional protections in this area are best 'elaborated with care,'" because "[state court] adjudication in this context occurs on a case-by-case basis . . . ." *Troxel* v. *Granville*, supra, 530 U.S. 73 (plurality opinion). The assessment of what terms and conditions are necessary in the third-party visitation context is highly fact dependent; see *DiGiovanna* v. *St. George*, supra, 300 Conn. 78; and cannot be undertaken "in a factual vacuum." *Lehrer* v. *Davis*, 214 Conn. 232, 234, 571 A.2d 691 (1990); see id., 235–36 (holding that record was inadequate to undertake "a constitutional review of § 46b-59").

Turning to the defendant's specific request for a no contact order between B and Riddell, we note that this request was untimely[15] and unaccompanied by an explanation regarding its origin or basis. The request, rather, was formulated as a naked demand resting on the classic invocation of absolute parental authority used to preempt discussion: "Because I'm the parent and I said so." This resort to fiat reflects a perfectly adequate parenting position in many day-to-day parent-child interactions, but it will not suffice when a judicial authority has determined that state interference in the parent-child relationship "is justified" because the third party has "demonstrated a compelling need [for third-party visitation] to protect the child from harm." *Roth* v. *Weston*, supra, 259 Conn. 229. Although the right to control a child's associations is a fundamental parental right; see id., 216–17; in the absence of an explanation, the trial court cannot evaluate the good faith nature of the parental request, assess the need for evidence to resolve disputed questions of fact, or fashion appropriate relief. See footnote 14 of this opinion. Because the defendant failed to give any reason in support of the requested term and condition regarding B's contact with Riddell, we conclude that the trial court properly denied the defendant's postjudgment motion.

We emphasize that our holding confers no parental rights on the plaintiffs; nor does it bestow any visitation rights on Riddell. As the trial court aptly observed, the order of visitation simply gave "visitation to the plaintiffs" and "[i]n no way, shape, or form did the court grant any visitation to [Riddell]" or create any parental rights on behalf of the plaintiffs. The trial court simply found that in the absence of any reason or any evidence to justify the defendant's requested restriction on the order of third-party visitation, there was no basis to find that the requested restriction was in the child's best interest. We agree and, therefore, affirm the judgment

of the trial court.

V

Lastly, the defendant claims that the amount of visitation awarded to the plaintiffs violates his fundamental parental rights under the fourteenth amendment to the United States constitution. The defendant points out that § 46b-59 is subject to strict scrutiny; *Roth* v. *Weston*, supra, 259 Conn. 218; and argues that the amount of visitation awarded under the statute must be narrowly tailored to further the state's compelling interest in sustaining the child's relationship with the third party. Under this theory, the defendant contends that any visitation in excess of the amount minimally necessary to sustain the child's relationship with the third party "constitutes a significant interference" with his parental rights.

Although the defendant filed various postjudgment motions challenging the order of visitation, he never asked the trial court to reconsider the amount of visitation or to articulate the basis for the amount of visitation awarded to the plaintiffs.[16] Because the trial court never had an opportunity to rule on this issue, we conclude that it is not preserved for our review. See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014) ("[i]t is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial" [internal quotation marks omitted]). Nonetheless, because the defendant's claim implicates his fundamental parental rights under the United States constitution, we consider whether review is appropriate under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[17]

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error, (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id.; see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). The burden is on the party seeking review of unpreserved constitutional claims under *Golding* to demonstrate both that the record is adequate for review and that the claim "is indeed a violation of a fundamental constitutional right." *State* v. *Golding*, supra, 213 Conn. 240. "If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we

will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id.

The trial court is in the best position to determine how the order of visitation should be implemented; *DiGiovanna* v. *St. George*, supra, 300 Conn. 73; and must set forth the "terms and conditions of visitation including, but not limited to, the schedule of visitation, including the dates or days, time and place or places in which the visitation can occur, [and] whether overnight visitation will be allowed . . . ." General Statutes § 46b-59 (e). "[T]he best interest of the child [standard] guides the court" in crafting these terms and conditions and "in determining how best to foster [the third-party] relationship." *DiGiovanna* v. *St. George*, supra, 78. The trial court must weigh "all the facts and circumstances of the family situation. Each case is unique. The task is sensitive and delicate, and involves the most difficult and agonizing decision that a trial judge must make." (Internal quotation marks omitted.) *Gallo* v. *Gallo*, 184 Conn. 36, 44, 440 A.2d 782 (1981). The trial court's factual findings may be reversed on appeal only if they are clearly erroneous. See *DiGiovanna* v. *St. George*, supra, 69 ("[t]o the extent that the defendant claims that the trial court should have credited certain evidence over other evidence that the court did credit, it is well settled that such matters are exclusively within the province of the trial court"); see also *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 377, 999 A.2d 721 (2010) ("To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [Internal quotation marks omitted.]).

In light of the inherently fact bound nature of the trial court's schedule of visitation, we conclude that the record is inadequate to review the defendant's constitutional challenge to the amount of visitation awarded to the plaintiffs under § 46b-59 (e). See *Lehrer* v. *Davis*, supra, 214 Conn. 234, 236 (recognizing "[t]he [fact bound] nature of . . . constitutional challenge[s] to § 46b-59" and counseling "against the adjudication of constitutional questions in a factual vacuum"). The defendant did not request, and therefore the trial court did not provide, particularized factual findings regarding the amount of visitation necessary to sustain the plaintiffs' relationship with B. "Without the necessary factual and legal conclusions furnished by the trial court . . . any decision by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127

S. Ct. 1328, 167 L. Ed. 2d 85 (2007). The record is "inadequate to establish whether the alleged constitutional violation did, in fact, occur"; id., 64; and, therefore, we decline to review the defendant's unpreserved constitutional claim.[18]

The judgment is affirmed.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Kahn was not present when the case was argued before the court, she has read the briefs and appendices, and has listened to a recording of the oral argument prior to participating in this decision.

[1] General Statutes § 46b-59 provides: "(a) As used in this section: (1) 'Grandparent' means a grandparent or great-grandparent related to a minor child by (A) blood, (B) marriage, or (C) adoption of the minor child by a child of the grandparent; and (2) 'Real and significant harm' means that the minor child is neglected, as defined in section 46b-120, or uncared for, as defined in said section.

"(b) Any person may submit a verified petition to the Superior Court for the right of visitation with any minor child. Such petition shall include specific and good-faith allegations that (1) a parent-like relationship exists between the person and the minor child, and (2) denial of visitation would cause real and significant harm. Subject to subsection (e) of this section, the court shall grant the right of visitation with any minor child to any person if the court finds after hearing and by clear and convincing evidence that a parent-like relationship exists between the person and the minor child and denial of visitation would cause real and significant harm.

"(c) In determining whether a parent-like relationship exists between the person and the minor child, the Superior Court may consider, but shall not be limited to, the following factors: (1) The existence and length of a relationship between the person and the minor child prior to the submission of a petition pursuant to this section; (2) The length of time that the relationship between the person and the minor child has been disrupted; (3) The specific parent-like activities of the person seeking visitation toward the minor child; (4) Any evidence that the person seeking visitation has unreasonably undermined the authority and discretion of the custodial parent; (5) The significant absence of a parent from the life of a minor child; (6) The death of one of the minor child's parents; (7) The physical separation of the parents of the minor child; (8) The fitness of the person seeking visitation; and (9) The fitness of the custodial parent.

"(d) In determining whether a parent-like relationship exists between a grandparent seeking visitation pursuant to this section and a minor child, the Superior Court may consider, in addition to the factors enumerated in subsection (c) of this section, the history of regular contact and proof of a close and substantial relationship between the grandparent and the minor child.

"(e) If the Superior Court grants the right of visitation pursuant to subsection (b) of this section, the court shall set forth the terms and conditions of visitation including, but not limited to, the schedule of visitation, including the dates or days, time and place or places in which the visitation can occur, whether overnight visitation will be allowed and any other terms and conditions that the court determines are in the best interest of the minor child, provided such conditions shall not be contingent upon any order of financial support by the court. In determining the best interest of the minor child, the court shall consider the wishes of the minor child if such minor child is of sufficient age and capable of forming an intelligent opinion. In determining the terms and conditions of visitation, the court may consider (1) the effect that such visitation will have on the relationship between the parents or guardians of the minor child and the minor child, and (2) the effect on the minor child of any domestic violence that has occurred between or among parents, grandparents, persons seeking visitation and the minor child.

"(f) Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted, nor shall such visitation rights be a ground for preventing the relocation of the custodial parent. The grant of such visitation rights shall not prevent any court of competent jurisdiction from

thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights.

"(g) Upon motion, the court may order the payment of fees for another party, the attorney for the minor child, the guardian ad litem, or any expert by any party in accordance with such party's financial ability."

[2] The plaintiffs will be referred to collectively as "the plaintiffs," except when it is necessary to identify them individually by name.

[3] In view of this court's policy of protecting the privacy interests of juveniles, we refer to the child involved in this matter as B. See, e.g., *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 396 n.1, 94 A.3d 588 (2014).

[4] The memorandum of decision states that the plaintiffs' contact with B was terminated on June 26, 2017, but the 2017 date appears to be a scrivener's error. It is undisputed that there had been a complete denial of visitation at the time the plaintiffs' petition for visitation was filed on November 3, 2016. Additionally, the trial court stated in its decision, which was issued on August 11, 2017, that the plaintiffs' visitation with B had been "terminated by the defendant father approximately a year ago . . . ." From this we conclude that the correct date on which the defendant terminated the plaintiffs' contact with B was June 26, 2016, less than four months after Nicole's death.

[5] Riddell, also known as Regina Boisvert, is B's maternal aunt, i.e., Nicole's sister and the plaintiffs' daughter.

[6] The order provided: "The defendant is . . . ordered to provide visitation of the minor child with the plaintiff Diane Boisvert on Friday, August 31, 2018, at 5 p.m. until Sunday, September 2, at 5 p.m., and every other weekend thereafter, and provide visitation with the plaintiff Thomas Boisvert, on Wednesday, August 29, [2018] from the end of school, and each Wednesday, [from] noon if there is no school, until 8 p.m." The court further ordered the defendant to "pay the plaintiffs' attorney's fees in the amount of $1500 within thirty days of this order."

[7] After oral argument in these consolidated appeals, this court, sua sponte, invited the filing of amicus curiae briefs from the Family Law Section of the Connecticut Bar Association, the Children's Law Center of Connecticut, the Office of the Public Defender, the Center for Children's Advocacy, and the Child Protection Unit of the Office of the Attorney General. We asked the proposed amici curiae to address the following questions in their briefs: (1) "Once a trial judge has decided to issue an order granting third-party visitation under . . . § 46b-59, do the custodial parent's substantive due process rights require the judge to order the [third party] to abide by all of the custodial parent's specific directives regarding care of the minor child during the visitation?" (2) "More generally, what legal standard must the trial judge apply when crafting the terms and conditions of visitation relating to any specific aspect(s) of the environment or care provided by the [third party] as to which the custodial parent objects? (Is it the 'best interests of the child' standard under . . . § 46b-59 [e], or is a different legal standard constitutionally required?)" And (3) "Does a different legal standard and burden of proof apply when a party moves for modification of the terms and conditions of a third-party visitation order under . . . § 46b-59?" The Connecticut Bar Association, the Children's Law Center of Connecticut, the Department of Children and Families, and the Connecticut Chapter of the American Academy of Matrimonial Lawyers accepted our invitation and submitted amicus briefs.

[8] *Troxel* produced six different opinions. The plurality decision has been widely criticized for its failure to provide adequate direction to courts and legislatures attempting to abide by its holding. See, e.g., D. Lannetti, "A Nonparent's Ability To Infringe on the Fundamental Right of Parenting: Reconciling Virginia's Nonparental Child Custody and Visitation Standards," 30 Regent U. L. Rev. 203, 210 (2018) ("[t]he *Troxel* decision is known today more for what it failed to address than what it actually decided, and its six opinions—with the noticeable absence of a majority opinion—unsurprisingly caused confusion for both courts and practitioners as they attempted to discern the [c]ourt's guidance, or lack thereof").

[9] In *Troxel* v. *Granville*, supra, 530 U.S. 73 (plurality opinion), the United States Supreme Court did not consider "whether the [d]ue [p]rocess [c]lause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation."

[10] "'Real and significant harm' means that the minor child is neglected, as defined in section 46b-120, or uncared for, as defined in said section." General Statutes § 46b-59 (a) (2).

[11] The defendant also filed a motion to open and terminate visitation on

the basis of his January 9, 2018 offer of visitation. The motion to open was denied by the trial court. Because the defendant did not appeal from the trial court's denial of this motion, we do not consider or decide the merits of that ruling.

[12] It should be recalled that a fit parent's decision-making authority also is protected at the threshold stage by § 46b-59 (c) (4), which directs the trial court to consider, in determining whether a parent-like relationship exists in the first instance, "[a]ny evidence that the person seeking visitation has unreasonably undermined the authority and discretion of the custodial parent . . . ." This provision does not guarantee that visitation will be permitted only to a third party whose views on child rearing are entirely harmonious with the parent's views, but it does provide a strong incentive for the third party to make sure that his or her decisionmaking does not unreasonably undermine the parent's authority.

[13] The situation becomes still more challenging because (1) the third party, like the parent, may allow animosity toward the opposing party to influence his or her views about the child's best interest, and (2) neither party may be fully aware of their underlying motivations in this context. The difficult task of sorting out these dynamic uncertainties is left to the discretion of the trial court based on a careful consideration of all of the evidence.

[14] As we previously indicated, if the requesting party is a parent who claims that the proposed terms and conditions are necessary to protect his or her fundamental parental rights to make decisions regarding the child's education, health, religion, or association, then the parent's determination of his or her child's best interest should be accorded special weight. See *Troxel* v. *Granville*, supra, 530 U.S. 69 (plurality opinion). Nonetheless, an explanation is necessary in order for the trial court to ascertain whether the proposed terms and conditions actually implicate the parent's fundamental parental rights, reflect sincerely held parental beliefs, and involve disputed questions of fact necessitating an evidentiary hearing. The requesting party's explanation and the opposing party's responses not only will provide the trial court with the information necessary to address the parties' concerns and fashion appropriate relief, but also will provide an appellate court with an adequate record to review the trial court's order, if necessary.

[15] It appears from the record that the defendant was aware that Riddell was living in Diane Boisvert's home at the time of the evidentiary hearing, but did not raise the issue as a concern or request any particular terms and conditions limiting B's contact with Riddell prior to the issuance of the trial court's visitation order. Furthermore, although the defendant filed several postjudgment motions, he never filed a motion to modify the order of visitation to include a no contact order between B and Riddell.

[16] At the hearing on the plaintiffs' first motion for contempt, the defendant testified that he believed the order of visitation "was way too much because the only time that I have to spend with my son is a couple hours after work and every weekend." Additionally, as explained in parts I and III of this opinion, the defendant filed a postjudgment motion to open and terminate visitation and a postjudgment motion to dismiss for lack of subject matter jurisdiction on the basis of his January 9, 2018 offer of visitation, which would have provided substantially less visitation than the amount ordered by the trial court. At no point, however, did the defendant argue that the amount of visitation ordered by the court violated his fundamental parental rights under the United States constitution.

[17] The defendant's failure affirmatively to request and brief his entitlement to *Golding* review does not preclude our consideration of his constitutional claim. See *State* v. *Elson*, 311 Conn. 726, 730, 91 A.3d 862 (2014) (holding that there is no requirement "that a party must 'affirmatively request' *Golding* review in its main brief in order to receive appellate review of unpreserved constitutional claims").

[18] Because the defendant has failed to establish the violation of his fundamental parental rights under the United States constitution, we need not reach the defendant's claim that the "magnitude as well as the duration of the constitutional deprivations" warrant vacatur of the order of visitation and dismissal of the plaintiffs' petition for third-party visitation.